UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BENNIE H. LOVETT, JR.,

                                Plaintiff         DECISION AND ORDER

-vs-
                                                         16-CV-6562 CJS

COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.
_____

## APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Kenneth R. Hiller, Esq. |
| | Elizabeth A. Haungs, Esq. |
| | Law Offices of Kenneth Hiller |
| | 60000 North Bailey Avenue, Suite 1A |
| | Amherst, New York 14226 |
| For the Defendant: | Heetano Shamsoondar, Esq. |
| | Social Security Administration |
| | Office of General Counsel |
| | 26 Federal Plaza, Room 3904 |
| | New York, New York 10278 |
| | Kathryn L. Smith, A.U.S.A. |
| | Office of the United States Attorney |
| | for the Western District of New York |
| | 100 State Street |
| | Rochester, New York 14614 |

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied the application of Bennie Lovett ("Plaintiff") for Social Security Disability

1

Insurance Benefits. Now before the Court is Plaintiff's motion (Docket No. [#12]) for judgment on the pleadings and Defendant's cross-motion [#16] for judgment on the pleadings. Plaintiff's application is granted and Defendant's application is denied.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts. The Court has reviewed the administrative record [#8] and will reference it only as necessary to explain this Decision and Order.

Plaintiff, born in 1961, claims to be disabled due primarily to back pain, beginning on April 17, 2012. Prior to the alleged onset date, Plaintiff had completed the Tenth Grade and had worked primarily at janitorial jobs, first at Dansville Junior High School (1998-2000) and later at the State University of New York at Geneseo (2000-2012). (228, 469). Those janitorial jobs involved heavy lifting. In 2011, Plaintiff injured his back at work while lifting sofas. (314). Plaintiff experienced severe back pain and used a cane to ambulate. Orthopedic surgeon Raman Dhawan, M.D. ("Dhawan") diagnosed severe spinal stenosis, and performed surgery. After surgery, Plaintiff experienced significant improvement, and was able to walk without a cane or other assistive device. By January 2012, Dhawan had cleared Plaintiff to return to work without any lifting restrictions.

In March 2012, Plaintiff returned to Dhawan for routine surgical follow-up, at which time he complained that he was having increased back pain and discomfort, and difficulty bending over and picking up objects. (275). Upon examination Dhawan found that Plaintiff had decreased range of motion. Dhawan advised Plaintiff to use Ibuprofen

2

for pain.

On April 20, 2012, Dhawan reported that Plaintiff was continuing to complain of back pain, though without radiculopathy or weakness in the legs. (277). Dhawan noted that following surgery in 2011, Plaintiff had been "doing extremely well," but then apparently over-exerted himself, resulting in increased pain. (277). Dhawan opined that Plaintiff could continue working, but with with lifting restrictions. (278).

However, four days later, on April 24, 2012, Plaintiff returned to Dhawan, "stating that he is unable to carry out lifting 50-100 lbs all the time." (279). Dhawan provided Plaintiff with a note removing him from work, and asked him to return in six weeks. (279). Dhawan stated that Plaintiff needed to continue with non-operative treatment, and opined that if Plaintiff's condition did not improve he might "need a fusion surgery [consisting of] L3-S1 interbody fusion." (279).

In May 2012 Plaintiff went to physical therapy treatment, where he complained of constant severe pain. (281-282). On May 22, 2012, Dhawan reported that Plaintiff was complaining of increased "excruciating" back pain after going swimming. (283). Plaintiff claimed to be unable to walk, stand or sit properly. (283). Dhawan requested a CT scan, and opined that Plaintiff should continue with non-operative treatment including over the counter pain and anti-inflammatory medication. (284).

On June 5, 2012, a CT scan was taken of Plaintiff's lumbar spine. (285-286). Dr. Dhawan later summarized the findings as "show[ing] the patient has a good laminectomy from LS3-S1 [(referring to the 2011 surgery)] [and] mild stenosis at L2-L3." (296).

On June 18, 2012, Plaintiff returned to physical therapy and indicated that his

3

pain had improved by 80%. (290) ("The patient reports 80% improvement with pain and ADL tolerance over the last 4 weeks."). Plaintiff stated that he still had pain radiating down one leg. (290). Plaintiff reportedly stated that he was "eager to return to work," but did not know if he could handle it yet. (290). The therapist noted "significant improvements in upright posture and . . . decreased trunk lean" while walking. (290).

However, just ten days later on June 28, 2012, Plaintiff reportedly told Dhawan that his pain was not improving, and that he wanted to proceed with "fusion" surgery. (294). At that time Plaintiff was taking a combination of Cyclobenzaprine, Oxycodone and Ibuprofen. (294). Upon examination, Plaintiff had antalgic gait and decreased range of movement, but negative straight-leg raising tests and normal strength and sensation. (294). Dhaman indicated that surgery would need to wait until Worker's Compensation gave approval. (295). In the meantime Dhawan opined that Plaintiff remained "100%" temporarily disabled. (295).

On July 23, 2012, Plaintiff's physical therapists discharged him from further treatment because he had "failed to make significant gains with Physical Therapy." (298).[1]

On August 3, 2012, Dhawan commented on the impending surgery by stating that it would consist of "L2-S1 fusion," and that "[s]ince the patient has developed stenosis at L2-L3 he would also need decompression and fusion at L2-L3." (297).

On September 27, 2012, Dhawan noted that Plaintiff still planned to have surgery and had "marked degenerative changes." (301).

---

[1] The apparent inconsistency between this report and the prior PT report is not explained.

On October 1, 2012, Dhawan performed surgery, to address "L2-S1 lumbar disk herniation." (315). The surgery involved the removal of the L3-S1 discs and fusion of those sections of spine. (318-321).

Following surgery Plaintiff developed "spontaneous [gastrointestinal] bleeding" related to preexisting cirrhosis of the liver. (516). On October 22, 2012, Plaintiff went to his primary care physician, Daniel Curtin, M.D. ("Curtin"), to be checked for liver failure. (517). Curtin opined that Plaintiff was not in liver failure.[2]

On October 26, 2012, Plaintiff reportedly told Dhawan that he was "doing well," that his back pain was "getting better," and that he had no leg pain at all. (354). Dhawan further stated, "The patient has been working," though he also checked a box on the report indicating that Plaintiff was not working. (354).

On November 5, 2012, Plaintiff returned to see Dr. Curtin for a checkup related to liver function and a physical examination. (479). Curtin performed a "complete physical examination" (480), and made no mention of Plaintiff being in pain or discomfort. Curtin also observed that Plaintiff had no problem walking, and that he had a "normal gait." (480). Curtin stated that Plaintiff appeared "well" and in no acute distress. (479). Plaintiff was able to sit and lie supine. (480). Regarding Plaintiff's back and spine, Curtin reported: "Spine: unremarkable, normal spine curvature. . . . Upper extremity joints: normal. Lower extremity joints: normal. L-S spines: normal." (480).

---

[2] However, regarding the cirrhosis, Curtin noted that Plaintiff had only recently stopped drinking and become sober: "He is NOW sober again. Stopped drinking 3-4 weeks ago (after been drinking for last 5 years.") (518). Such statement is inconsistent with Plaintiff's contemporaneous medical records pertaining to his back problems, in which he either denied drinking alcohol at all (261) or claimed to drink only occasionally. (314) ("The patient drinks on occasions, but considers himself not to drink at all."); (356) ("Denies excessive drinking.").

5

Despite Plaintiff's recent back surgery, Curtin made no mention of any lingering back problems, and, indeed, the only reference to such surgery was that Plaintiff still had a "left sided drain in place," which had been placed to address a post-surgery abscess. (480, 328, 344). Curtin recommended that Plaintiff engage in "daily exercise with goal of at least 30 minutes 4 x week." (480).

On December 14, 2012, Dhawan reported that Plaintiff was "doing better" and did "not have any back pain." (360). Dhawan stated that Plaintiff was walking, but was "still us[ing] a cane." (360). Upon examination, Dhawan reported "good range of movement" and normal sensation and strength. (360). Dhawan further stated that Plaintiff was able to stand and walk on his toes and heels. (360).

On January 24, 2013, Harbinder Toor, M.D. ("Toor") performed a one-time consultative internal medicine examination at the request of the Commissioner. (465-468). Toor reported that Plaintiff appeared to be in "moderate pain," was using a cane to ambulate, and was also wearing a back brace. (466). Plaintiff displayed an "abnormal, slightly wide-based, unsteady and slightly limping" gait. (466). Plaintiff declined to perform several aspects of the usual examination, including testing of flexion, extension and rotation of the lumbar spine and straight-leg testing, purportedly because he was in too much pain. (467). This is odd and unexplained, as Plaintiff consistently allowed Dhawan to perform range-of-movement tests and straight-leg-raising tests, even when he claimed to be in "excruciating" pain. (283). Toor noted that Plaintiff had a normal neurologic exam, full strength in the upper and lower extremities, and normal fine motor activity in the hands and fingers. (467). Toor opined as follows: "He has moderate to severe limitations with standing, walking, bending, sitting, and

6

lifting. Pain in the lower back can interfere with his daily physical routine and balance." (467-468). However, due to the limited nature of the examination, such opinion appears to be based primarily, if not entirely, on Plaintiff's outward presentation and his subjective statements to Toor, rather than on objective findings.

On the same day as Toor's examination, January 24, 2013, psychologist Angela Stewart, Ph.D. ("Stewart") performed a one-time psychological evaluation of Plaintiff at the Commissioner's request, inasmuch as Plaintiff was complaining of depression. (469-473). Plaintiff indicated that he had been depressed since becoming unable to work. (469). Plaintiff indicated that he took "oxycodone 5mg 4 to 6 times a day" for back pain, and also used marijuana three times per day. (469-470). Plaintiff stated that he had difficulty sleeping due to back pain. (469). Plaintiff's mental examination was essentially normal, except that he had "mildly impaired" attention, concentration and memory. (471). Stewart diagnosed Plaintiff with, *inter alia*, "adjustment disorder with depressed mood" and "cannabis abuse," but opined that he did not have "any psychiatric problems that would significantly interfere with his ability to function on a daily basis." (472). Indeed, Stewart described Plaintiff's daily activities as follows:

> He is able to dress, bath, and groom himself, cook and prepare food, do general cleaning, laundry, shopping, driving, and taking public transportation. He needs help from his wife managing money. Socialization: The claimant says he has numerous friends with whom he gets together, watches sports, and talks. His family relationships include his wife, his brother, his sisters, both local and out of town. Hobbies and interests include sports, model cars, and fishing. He spends a typical day by getting up, making coffee. He might go visit his neighbors. He may go to his doctors appointments. Friends might stop by.

(471).

On February 1, 2013, Dhawan stated: "Patient is doing better. Patient states that his back feels good." (655). Dhawan stated that Plaintiff's range of movement was "decreased," and that he should work on "increas[ing his] range of movement" and walking for exercise. (655).

On May 17, 2013, Dhawan noted that Plaintiff claimed to be "doing better" "and on the whole he is doing well." (800). Upon physical examination, Dhawan stated: "Patient has good range of movement, though decreased. Sensation and strength is normal. He could stand on his toes, could stand on his heels." (800).

On July 19, 2013, Dhawan reported that Plaintiff had "improved significantly" since his surgery, and was doing "extremely well" (647), though he remained "100%" temporarily disabled. (648).

On August 30, 2013, Dhawan reported that Plaintiff was "doing very well," with "some dull pain in his lower back" but no radiculopathy. (643). Plaintiff continued to use cyclobenzaprine and oxycodone. (643). Dhawan stated that Plaintiff had decreased range of movement, but normal sensation and strength in his legs. (643). Dhawan opined that Plaintiff should "cut down on his medication" and "continue with physical therapy of his back" to improve range of movement and strength. (644).

On October 4, 2013, Dhawan reported: "[Patient] I doing better. He states that he has minimal discomfort. He has no radiculopathy." (639). Dhawan stated that Plaintiff's range of movement was "good" and that straight leg raising tests were negative. (639). Overall, Dhawan opined that Plaintiff was "doing extremely well." (639).

On January 10, 2014, Dhawan reported: "The patient states that he is doing better. He has some dull pain but by and large he is doing better. According to the

8

patient, he is able to carry out most of his activities within restriction. His range of movement is acceptable. When his activity level increases, the patient gets discomfort." (635).

On February 14, 2014, Dhawan stated that Plaintif was "doing better," and "on the whole, he seems to be doing well." (630). On March 14, 2014, Dhawan reported that Plaintiff "ha[d] some discomfort in his back," but was "doing better" and only taking "pain medication on and off." (627).

On April 18, 2014, Plaintiff reportedly told Dhawan that he was "doing better after surgery, but still has some dull pain his back." (623). Dhawan stated that Plaintiff "should continue with exercises and work on his core muscles," and "remain[ed] 100% disabled." (624).

On May 23, 2014, Dr. Dhawan reported that Plaintiff was was doing well and walking better, but had dull pain in his back. (619) ("The patient states he is doing well. he denies any radiculopathy. He has some dull pain in his back. He is walking better."). Dhawan noted that Plaintiff was "not currently working." (619). Dhawan stated that radiographic studies of the lumbar spine "show excellent fusion between L2 and S1." (619). Dhawan performed a physical exam and noted, "He has decreased range of movement. He has a negative straight leg raising test. Sensation and strength are normal." (619). Overall, Dhawan commented that Plaintiff was doing well but had dull back pain. (620). Dhawan stated that Plaintiff remained "100%" temporarily disabled. (620).

On July 11, 2014, Dhawan stated that Plaintiff was doing well post-surgery, and was "walking better," with only "some dull back pain." (821). Dhawan reported that

9

Plaintiff complained of a restricted range of movement, and that "whenever he tries to over do it, he gets increasing pain." (821). Dhawan advised Plaintiff to continue exercising and working on his range of movement. (822).

On September 12, 2014, Dhawan saw Plaintiff for a "routine visit" and noted that Plaintiff claimed to be "doing well," with "discomfort in his lower back but no radiculopathy." (823). Dhawan observed that Plaintiff was "walking well." (823). Upon examination Plaintiff had decreased range of movement but normal strength and negative straight-leg raising. (823). Dhawan opined that Plaintiff remained "100%" temporarily disabled. (824).

On October 24, 2014, Dhawan reported that Plaintiff "just has some back pain and he also gets spasms but by and large he is doing well." (825).

On December 5, 2014, Dhawan stated: "The patient is doing well. His numbness and tingling have resolved. He does not complain of any pain in his legs. He gait is definitely improved but the patient has discomfort in his lower back." (827). Dhawan stated that Plaintiff's range of movement was "decreased" but "pain free." (827).

On February 27, 2015, Dhawan reported that Plaintiff was complaining of increasing pain after falling on ice and landing on his back. (32). X-rays showed no fracture or damage to the prior surgical fusion sites. (32). Dhawan stated that Plaintiff "has been using a cane for the last 2-3 weeks." (32). (This is the only mention of cane in Dhawan's reports after the December 14, 2012, office visit note.(360)). Dhawan recommended that Plaintiff take pain medication and use heat on his back.

On April 3, 2015, Dhawan reported that Plaintiff was "doing well," and that his "pain is well under control." (30). Dhawan noted that the x-rays showed that the 2012

10

surgery had achieved an "excellent fusion." (30).  Dhawan stated that Plaintiff was "not currently working." (30).  Dhawan stated: "He has a slightly antalgic gait but he is walking well." (30).

On April 28, 2015, Dhawan signed a residual functional capacity form for Plaintiff relating to "disorders of the spine." (38-42).  However, Dhawan left the vast majority of the form blank.  Dhawan stated that Plaintiff had degenerative disc disease and low back pain, and that the prognosis was "good." (38).  Dhawan stated: "Patient is healing well – no radiculopathy but has slight antalgic gait." (38).  Dhawan did not complete any of the sections dealing with Plaintiff's ability to perform specific activities such as lifting, carrying, standing or sitting, and did not expressly indicate whether or not Plaintiff was able to work.

## PROCEDURAL BACKGROUND

Plaintiff applied for disability benefits, claiming to have become disabled on April 17, 2012.  After the Commissioner denied the claim initially, on August 13, 2014, a hearing was conducted before an Administrative Law Judge ("ALJ"). At the hearing, Plaintiff testified to, *inter alia*, the following:  He stopped working because he could not perform the heavy lifting required by his janitorial job (63); he has not tried to find other work since he stopped working in March-April 2012 (63, 64);  due to back pain he is unable to perform activities such as walking to the store, "do[ing] stuff around the house," and enjoying hobbies (64);  he experiences no side effects from the medications that he takes (70); his doctors never recommended physical therapy after his surgery in 2012 (70); when his pain flares up it radiates across his lower back and into both legs (71); posturally there is no position that is comfortable for him, which

11

requires him to constantly change position (71); neither pain medications nor heat are particularly effective at relieving his pain (72); he experienced no improvement in symptoms following the 2012 surgery, but rather, his condition "stayed the same" (72); he is unable to perform household chores (73, 82-83); he does not do anything during the day to "occupy his time" except "sit outside"[3] (74); he experiences pain from walking a city block, and is able to stand for "about, maybe, 15 minutes" (78); an unspecified doctor told him not to lift more than five pounds following his surgery in 2012 (78); he uses a cane "every day," to stand and walk (80-81, 86); it is painful for him to carry a half gallon of milk a short distance (81); and he has pain and weakness in his legs (84).

A vocational expert ("VE") also testified at the hearing in response to various hypothetical questions posed by the ALJ and Plaintiff's counsel. The VE stated that a hypothetical claimant with the residual functional capacity ("RFC") proposed by the ALJ (described further below) would not be able to perform Plaintiff's past relevant work, but would be able to perform various jobs categorized as light work. In response to the ALJ's questioning, the VE further indicated that a hypothetical claimant who needed an "hand-held assistive device . . . for standing and ambulating" would not be able to perform light work, and would be restricted to sedentary work. (90).

At the close of the hearing Plaintiff's counsel argued, *inter alia*, that Plaintiff is limited to sedentary work at most, and that given Plaintiff's age, education and work experience, the Grids would direct a finding of disability. (93-94).

On February 4, 2015, the ALJ issued his Decision, finding that Plaintiff was not

---

[3]Plaintiff gave this answer in response to being asked whether he watches television, reads books or has other hobbies. (74).

disabled at any time between the alleged date of onset (April 17, 2012) and the date of his decision. Applying the familiar five-step sequential analysis used to evaluate social security disability claims, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (15). At step two, the ALJ found that Plaintiff had a single severe impairment: "degenerative disc disease-lumbar status post fusion." (15). The ALJ further found that Plaintiff had non-severe impairments, including hepatitis C, cirrhosis of the liver, a history of polysubstance abuse, depression and anxiety. (15-16). At step three, the ALJ found that Plaintiff's impairments did not meet-or-medically-equal a listed impairment. (17).

Before reaching step four of the sequential analysis, the ALJ found that Plaintiff had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) except [that he] is prohibited from climbing ladders, ramps, and scaffolds. Further, the claimant would need to avoid slippery and uneven surfaces, hazardous machinery, and unprotected heights. Finally, the claimant is limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.

(17).

In explaining that determination, the ALJ reviewed the medical evidence, including Dhawan's notes, Toor's report and various diagnostic test results. (17-19). The ALJ also reviewed Plaintiff's subjective allegations concerning his abilities, including his claim that he needed a cane to ambulate. (17-18). The ALJ stated that he gave "some weight" to Dhawan's opinion, rendered in January 2012 (following Plaintiff's first surgery), that Plaintiff "could return to work without restrictions despite the

13

diagnosis of lumbar spinal stenosis." (19). The ALJ stated that he gave only "little weight" to Toor's opinion, because it was a one-time examination, and because the findings were "not fully consistent with the totality of the medical records," "especially the x-rays that reflected normal findings." (19). These "x-rays" cited by the ALJ were Ex. 1F at pp. 14 (x-ray taken on October 7, 2011)[4] & 35 (CT scan taken on June 5, 2012)[5], and Ex. 7F at p. 11 (x-rays taken after the 2012 surgery, showing "good fusion.")[6]. The ALJ found that Plaintiff's subjective allegations were "not entirely credible" and "not consistent." (18).

At step four of the sequential analysis, the ALJ found that Plaintiff is not capable of performing his past relevant work as a janitor. (19-20). However, the ALJ found at step five that Plaintiff could perform light jobs identified by the VE, namely, small parts assembler, inspector/hand packager, and assembly-machine tender. (20). Consequently, the ALJ found that Plaintiff is not disabled.

Plaintiff appealed to the Appeals Council, and submitted additional medical records consisting of notes from Drs. Dhawan and Curtin. (2, 5). However, the Appeals Council declined to review the ALJ's determination. (1).

On August 11, 2016, Plaintiff commenced this action. On April 14, 2017, Plaintiff filed the subject motion [#12] for judgment on the pleadings, and on July 20, 2017, Defendant filed the subject cross-motion [#16] for judgment on the pleadings. On November 30, 2017, counsel for the parties appeared for oral argument, with

---

[4]Referred to in Dhawan's notes, Record at p. 265

[5]Record at p. 285.

[6]Referred to in Dhawan's notes, Record at p. 627.

14

Defendant's counsel appearing by telephone with the Court's permission.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

DISCUSSION

Plaintiff contends that this action must be remanded for two reasons. First, Plaintiff alleges that the ALJ erred when making his RFC determination (that Plaintiff could perform less than a full range of light work), because he did not "evaluate Plaintiff's need for a cane."[7] According to Plaintiff, the ALJ "completely ignored" the issue of "whether or not Plaintiff need[s] a cane."[8] Plaintiff contends that this is a "crucial" issue, because if he must use a cane to stand and walk, as he claims, then he is restricted to sedentary work at most, and would therefore be found disabled under the grids, due to his age, education and work experience.

Second, Plaintiff contends that the ALJ erred in making his RFC determination,

---

[7] Pl. Memo of Law [#12-1] at p. 8.

[8] Pl. Memo of Law [#12-1] at p. 9.

15

because it is "unsupported by any medical opinion."⁹ More specifically, Plaintiff contends that the ALJ erred by giving "some weight" to an "outdated opinion" by Dr. Dhawan, and by giving only "little weight" to Toor's opinion, "le[aving] the ALJ with no more than his lay opinion to interpret the functional effect of Plaintiff's lumbar spinal impairments status post two surgeries."¹⁰ Plaintiff further contends that the ALJ's attempt to draw conclusions about his functional abilities from raw x-ray results "is suspect" and erroneous.¹¹

Defendant responds that the ALJ's decision applied the correct legal standards and is supported by substantial evidence. For example, Defendant maintains that the ALJ properly considered whether Plaintiff needed to use a cane, and determined that he did not.¹² Defendant further contends that the RFC determination is supported by medical evidence, considering the record as a whole, "including treatment notes from Dr. Dhawan and Dr. Curtin," and "Plaintiff's self-reported activities of daily living." ¹³

As the Court observed during oral argument, this might have been an easier case for the ALJ to resolve if Dr. Dhawan had completed the RFC evaluation that he was provided in April 2015. Why Dhawan elected not to do so is unclear. However, the most-likely explanation may be that he intended the limited information that he included

---

⁹Pl. Memo of Law [#12-1] at p. 11.

¹⁰Pl. Memo of Law [#12-1] at p. 11 (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) for the proposition that "[w]hile an ALJ may pick and choose between various medical opinions, she [sic] may not substitute her [sic] own medical judgment for that of a medical expert.").

¹¹Pl. Memo of Law [#12-1] at p. 13.

¹²Def. Memo of Law [#16-1] at pp. 13-15.

¹³Def. Memo of Law [#16-1] at pp. 16-17.

in the report to convey that Plaintiff is not disabled. Indeed, the only residual problem that Dhawan identified was Plaintiff's "slight antalgic gait." (38). Certainly, the report does not indicate that Plaintiff is disabled.

Dhawan's office notes similarly never explicitly discuss Plaintiff's residual functional capacity for work following the 2012 surgery. At most, the notes indicate that Plaintiff remained 100% *temporarily* disabled, though that could easily mean only that Plaintiff was not able to return to his usual job as a janitor, which required heavy lifting. In that regard, Dhawan repeatedly noted that Plaintiff was not "currently working," as opposed to stating that Plaintiff was unable to ever work again.

However, while Dhawan's notes never expressly indicate whether Plaintiff can perform light work, they could support such a finding. In that regard, after Plaintiff's first successful surgery in 2011, Dhawan cleared Plaintiff to return to work without restrictions, even though he knew that Plaintiff's work involved lifting up to 100 pounds. Although Plaintiff subsequently over-exerted himself, necessitating the second surgery in 2012, Dhawan opined that the second surgery was a great success, and he documented Plaintiff's steady improvement during the months and years that followed.[14] Indeed, Dhawan's notes suggest that following the period of recovery after the second surgery, Plaintiff's only remaining problems were some restriction in range of movement, some lingering discomfort in the low back (which was controlled with medication), and a need for further physical conditioning. In other words, it appears

---

[14]The only exception to this is the termporary setback that Plaintiff experienced after he fell on ice in 2015. Consequently, Plaintiff's insistence that his condition never improved after the second surgery (72) seems entirely inconsistent with Dhawan's recorded observations.

from Dhawan's notes that Plaintiff came within reach of his baseline following his first successful surgery.[15]  Consequently, although Plaintiff continued to complain of lingering discomfort and dull pain in his back following the second surgery, and while Dhawan continued to opine that Plaintiff was temporarily disabled from performing his heavy janitorial job, it seems likely that Plaintiff nevertheless regained the ability to perform less-taxing work.  Furthermore, Plaintiff's statements to Dr. Stewart indicate that after the second surgery he remained capable of performing extensive activities of daily living. (471).

Nevertheless, the Court agrees with Plaintiff that the ALJ's RFC determination is erroneous insofar as it appears to be unsupported by medical evidence.  To begin with, the Court agrees with Plaintiff that the ALJ erred by choosing to rely upon an outdated opinion from Dr. Dhawan.  As Defendant admits, Dhawan's opinion in January 2012 that Plaintiff could return to work without restrictions "was given prior to Plaintiff's alleged onset date,"[16] and as such, it has little relevance to the ALJ's determination in this particular case.  Consequently, the ALJ's decision to place emphasis on this report (19), without an accompanying acknowledgment that Plaintiff's condition subsequently deteriorated to the point that he needed additional surgery, suggests error.

In this same vein, the Court agrees with Plaintiff that the ALJ erred in choosing to rely upon "x-rays that reflected normal findings" when assessing Plaintiff's credibility

---

[15]Moreover, as discused above the results of Curtin's complete physical examination in November 2012 were essentially normal. (479-480).

[16]Def. Memo of Law [#16-1] at pp. 17-18.

18

and Toor's report.[17] In this regard, not only did the ALJ err in attempting to rely upon his own layman's interpretation of the radiological findings, but he reached the wrong conclusion. At least, he reached a conclusion that was opposite of that reached by Dr. Dhawan, who is a spinal surgeon. In particular, while the ALJ asserted that the radiological reports (x-ray, CT scan) "reflected normal findings" (19), Dhawan interpreted some of these same reports, in conjunction with Plaintiff's continued complaints of pain, as indicating that Plaintiff required additional spinal-fusion surgery.[18] In sum, the ALJ does not explain why, if the reports showed normal findings, Dhawan cited them when documenting why surgery was necessary.[19] Accordingly, the Court concludes that insofar as the ALJ relied upon his own interpretation of the radiological reports to evaluate Toor's report and to assess Plaintiff's credibility, he committed error that requires a remand.

Regarding Plaintiff's argument that the ALJ failed to consider whether he needed a cane to ambulate, a court could properly find both that the ALJ's decision implicitly found that Plaintiff does not need a cane to ambulate, and that there is substantial

---

[17]As discussed above, there were other reasons why he could have done so. Most notably, Plaintiff's presentation at the consultation with Toor was entirely inconsistent with his presentation during multiple office visits with Dhawan (and Curtin) at around the same time.

[18]The "x-rays" cited by the ALJ were Ex. 1F at pp. 14 (x-ray taken on October 7, 2011) & 35 (CT scan taken on June 5, 2012), and Ex. 7F at p. 11 (x-rays taken after the 2012 surgery, showing "good fusion."). The first of these was taken prior to the alleged onset of disability and has little relevance to the issue of disability. The third report was obtained after the second surgery, and showed that Plaintiff's spine had been successfully fused, but did not address his ongoing level of disability, if any. The second report, which was an MRI report referred to at page (296) of the record, purportedly showed "mild stenosis at L2-L3," which Dhawan later surgically corrected. To be fair to the ALJ, the Court itself was somewhat confused when Dhawan initially indicated that the June 5, 2012, CT scan showed "mild stenosis at L2-L3" (296), but later opined that the radiologic evidence showed "marked degenerative changes." (301). Nevertheless, it does not appear that the ALJ accurately interpreted the subject reports.

[19]The Worker's Compensation doctors apparently agreed with Dr. Dhawan's interpretation of the reports.

evidence in the record to support such a finding. Nevertheless, and inasmuch as the case is being remanded anyway, this Court agrees with Plaintiff that the ALJ's decision in this case is unnecessarily vague on this point, particularly in light of the unique facts of this case and the ALJ's clear awareness of the importance of this potentially-dispositive issue. (89). Accordingly, upon remand the Commissioner should clarify this issue.

## CONCLUSION

Plaintiff's application for judgment on the pleadings [#12] is granted, and defendant's cross-motion [#16] is denied. The matter is remanded to the Commissioner for further administrative proceedings.

So Ordered.

Dated: Rochester, New York  ENTER:
      December 1, 2017

                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge